LAWRENCE KOSHINSKI, Appellee, *vs.* THE ILLINOIS STEEL COMPANY, Appellant.

*Opinion filed December 17, 1907.*

1. TRIAL—*when damage case from explosion is properly left to the jury.* In an action by a steel mill employee for an injury from an explosion of molten metal in a vessel just after new metal had been added to an "over-blown heat," the fact that plaintiff's witness, who testified that an explosion might result under such circumstances, is a chemist, whose knowledge of the matter is limited to laboratory tests, affects only his credibility and does not justify the court in directing a verdict in disregard of such testimony.

2. INSTRUCTIONS—*when modification of an instruction does not change its meaning.* An instruction containing a direction to return a verdict for the defendant "if the evidence is evenly balanced, or if it preponderates in favor of the defendant, or if you are in doubt as to the preponderance," is not changed in meaning by sub-

stituting for the last clause the words, "or if you are unable to determine as to its preponderance," and such instruction as originally presented or as modified is not objectionable. ·

3. SAME—*when striking argument from instruction is proper.* It is not error to strike out of an instruction an argumentative reference to the binding force of the juror's answers to questions upon their examination and to their oaths as jurors, and to make the instruction read, "It is your duty, as jurors, to try this case as to the facts upon the evidence produced upon the witness stand and the law as given you in these instructions by the court."

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. FRANK L. HOOPER, Judge, presiding.

GARNSEY & WOOD, (KNAPP, HAYNIE & CAMPBELL, of counsel,) for appellant.

BARR, BARR & BARR, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On October 16, 1905, between ten and eleven o'clock at night, the appellee, Lawrence Koshinski, while working for the appellant, Illinois Steel Company, in its converting mill at Joliet, was injured by an explosion in a converting vessel known as No. 3, and brought this suit in the circuit court of Will county to recover damages for his injuries. He had a verdict for $2500, upon which judgment was entered, and an appeal being taken to the Appellate Court for the Second District, the judgment was affirmed, and a further appeal was taken to this court.

The assignment of error which is chiefly urged in argument is based on the refusal of the trial court to direct a verdict of not guilty at the close of all the. evidence. The position taken by counsel is, that the cause of the explosion is absolutely unknown; that some unforeseen agency pro-

duced it; that the vessel was not negligently managed, and that the explosion was of such a nature that it could not reasonably have been foreseen by the exercise of ordinary intelligence and prudence, and therefore the defendant was not liable. In order that the argument may be understood it seems necessary to make a somewhat extended statement of the facts. There was no controversy at the trial concerning such facts, and they are as follows:

The defendant, Illinois Steel Company, manufactures steel by the Bessemer process, by which the ore is first melted, part in a cupola and part in a blast furnace, and the two are then mixed in a molten state and put in what are called vessels. These vessels are great iron pots, and vessel No. 3 was eleven feet in diameter at the center or largest place and ten feet in diameter where the bottom was joined on. The top was cone-shaped, with an opening about three feet in diameter, and the bottom was rounded and fastened on with hangers about two feet apart, each capable of sustaining twenty tons' weight. The vessel was suspended upon trunnions connected with a band around it, and it could be turned upon the side by means of hydraulic pressure, either to the north or south, in a semi-circle. In the bottom there were pipes or openings called "tuyeres," made of fire-clay, with seven one-half-inch holes to blow air into the vessel. It would hold from seventy-five to eighty tons of molten iron, but it was called a twelve-ton vessel, and that was the proper charge when making steel. When molten iron was to be run into the vessel it was turned over toward the north on its side and the iron was run in, making a depth of twelve to fourteen inches for twelve tons. That was called a "heat," and the vessel was then turned up vertically, and before turning, the air was turned on at the bottom and forced through the tuyeres. When the vessel was upright, the force of the air was sufficient to keep the metal from running down through the tuyeres. The forcing of the air through the molten metal increased the heat until

the carbon and other impurities were burned out. The "steel blower," who stood on a platform about one hundred and fifty feet away, could tell by the the color of the flame at the top of the vessel when the heat was blown and the metal ready to be poured off. While the air was forced into the vessel it kept the iron in a state of ebullition or boiling, and when the heat was blown the metal was poured out by tipping the vessel on its side toward the south and the liquid metal was run into a ladle, in which it was taken to the molds to cool. The time necessary to keep the air blowing through the metal in order to burn out the carbon and other impurities, which is termed "blowing a heat," ranges from six or seven to eighteen minutes. There are two kinds of steel,— soft and hard. In blowing soft steel all the molten metal is put in at once and the vessel is turned up and the heat blown. When the flame indicates the proper condition the vessel is turned over and emptied into the ladle. In blowing hard steel about eighteen hundred pounds less than a full heat is put in the vessel, which is then turned up and the heat blown just the same as in making soft steel, but when the heat is blown the vessel is turned back again toward the north and about eighteen hundred pounds of the same kind of molten metal is added to re-carbonize the mass. The air is again put on and the vessel is turned over and emptied at once. In blowing a heat about nine per cent is taken out by the elimination of the carbon and other impurities. After a heat is blown properly, if the air is still forced in the oxygen will pass into the metal, which will become oxide of iron, or, in other words, iron rust, and this change occurs rapidly after the carbon has burned out. When the molten metal is over-blown and becomes oxide of iron it is very much lighter, and if new metal with the impurities in it is added it will sink to the bottom and there will be a re-action or violent boiling of the whole mass. At the time of the accident in this case soft steel was being blown in vessel No. 3, and when the steel blower found that the heat was

properly blown, as indicated by the flame, he attempted to turn the vessel down to run the metal out, but found there was something wrong with the hydraulic apparatus and the vessel could not be turned. He blew the whistle, and the superintendent of the converter came to see what the trouble was and started to hunt up the machinist, but was unable to find him. After some delay it was discovered that the back-pressure valve had been closed by a mistake when the machinists were working on another vessel. The valve was turned so that the vessel could be tipped, but in the meantime the heat had been over-blown and burned. In order to save the heat, which was spoiled, the vessel was turned back and about fifteen or eighteen hundred pounds of molten metal was added. The steel blower blew the whistle for the blast of air and started to put on the blast preparatory to raising the vessel when the bottom blew off, scattering about ten or eleven tons of molten metal over the plant. The plaintiff was working on a mold-cleaning platform sixty-five feet from the vessel, and was severely burned and otherwise injured. The vessel was re-lined every Sunday and the accident occurred Monday night.

The claim of the plaintiff at the trial was, that when the heat was over-blown and burned, the addition of the new molten metal, with its impurities, produced a re-action, which caused the explosion. There was evidence in his behalf that where a heat is over-blown and oxide of iron produced, the addition of new metal, combining with the oxide of iron, produces an instantaneous and violent ebullition of an explosive nature. It was conceded that in making hard steel there was no danger of an explosion by the addition of new metal, but the theory of the plaintiff was that the absence of danger arose from the metal in the vessel not being over-blown. It is argued that this testimony came from a chemist or metallurgist that knew nothing about the question except from laboratory experiments, and that defendant was not required to take notice of a theory demonstrated

only by such experiments when no explosion ever occurred in actual practice. Witnesses testified on the part of the defendant that while there would be a re-action and boiling of the metal by the addition of the new metal, there was no danger of an explosion. They said there had been frequent cases of over-blown heats where new metal was put in and there was no explosion, but one witness who had been blowing for twenty-five years had only known of from four to eight such instances, and another had known of two or three in ten or twelve years. As to the theory respecting oxide of iron, the defendant introduced evidence that thermit, composed of three parts of oxide of iron and one part of aluminum, could be put in the ladles and would increase the temperature from two to three thousand degrees in seven seconds, and would produce a violent re-action but never produce an explosion. It will be apparent that the extent of the knowledge of the witness who testified for the plaintiff that there would be an explosion only affected his credibility, and it cannot be said that the few instances of over-blown heats testified to by witnesses for the defendant conclusively established that no explosion would occur. This heat was very badly burned and over-blown, and the conditions may have been quite different from the few instances observed by the witnesses. The court did not err in refusing to direct the verdict.

Some criticism of rulings of the trial court on the admission of testimony is indulged in by counsel, but we find nothing worthy of particular notice. There was no error in that respect.

The defendant asked the court to give an instruction containing this direction: "And you will return a verdict for the defendant if the evidence is evenly balanced, or if it preponderates in favor of the defendant, or if you are in doubt as to its preponderance." The court changed it to read, "and you should return a verdict in favor of the defendant if the evidence is evenly balanced, or if it prepon-

derates in favor of the defendant, or if you are unable to determine as to its preponderance." Counsel say that an instruction containing the exact language changed by the court was approved in *North Chicago Street Railroad Co.* v. *Fitzgibbons,* 180 Ill. 466. In that case an instruction directing the jury to return a verdict for defendant "if all the evidence was equally balanced, or if the preponderance was in favor of the defendant, or the jury were in doubt and unable to say on which side was the preponderance," was mentioned in passing on the question whether another instruction authorized the jury to disregard the evidence for the defendant, and nothing was said about the propriety of the instruction. We see no objection, however, to it, either as presented to the court or as it was given, and do not regard the modification as changing the meaning. If the jury are in doubt as to whether the preponderance of the evidence is on one side or the other they cannot say on which side it does preponderate, and are therefore unable to say. To justify a verdict for one who has the burden of proof, the jury must be able to say that the greater weight of the evidence is on that side. The instruction as asked might have properly been given, but as changed and given it amounted to the same thing. An ordinary jury would not think of raising a question as to what sort of a doubt the court referred to, but would understand it in its natural and ordinary sense.

Another instruction as tendered was as follows:

"You are instructed that your answers to the questions propounded to you upon your examination before being accepted as jurors in this case are as binding upon you now as then; that by your oath as jurors to try this case you are bound to try it as to the facts upon the evidence as produced upon the witness stand and the law as given to you in these instructions by the court."

The court modified it to read as follows: "It is your duty, as jurors, to try this case as to the facts upon the evi-

dence produced upon the witness stand and the law as given you in these instructions by the court." The instruction as tendered was argumentative in form and the instruction as given clearly stated the duty of the jury, so that there was no error in the modification.

Counsel say that the third and fourth instructions offered by the defendant, and refused, were proper and should have been given. The principles contained in them were fully covered by other instructions, and the court did not err in refusing to re-state the propositions.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*