Marion Laurent, Plaintiff-Appellant, v. Burdette Rinehart, Defendant-Appellee.

Gen. No. 10,748.

Opinion filed May 17, 1954.
Released for publication June 4, 1954.

B. JAY KNIGHT, of Rockford, and LAURIE LARSON, of Belvidere, for appellant.

MAYNARD & MAYNARD, of Rockford, for appellee; JAMES F. MAYNARD, of Rockford, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

Plaintiff, Marion Laurent, is the wife of Clarence Laurent with whom she had not been living for five months prior to November 11, 1951. Before her separation from her husband she was employed in a restaurant and became acquainted with the defendant, Burdette Rinehart, then twenty-one or twenty-two years of age, who was employed as a night foreman at the Belvidere Foundry. The plaintiff contemplated getting a divorce from her husband which was to be financed by the defendant and after the divorce the plaintiff and defendant expected to be married.

About November 5, 1951, the plaintiff and her husband decided to again live together. On the evening of November 11, 1951, they were both at Blatchford's Tavern in Belvidere. About nine o'clock that evening the defendant came into the tavern while Mr. and Mrs. Laurent were there. Shortly thereafter the bartender of the tavern sent Mr. Laurent down the street for some change, and after he left, Mrs. Laurent left the tavern with the defendant in his car, a 1946 Pontiac. Between 1:30 and 2:30 o'clock the following morning, they left Rainbow Gardens, another tavern, some distance east of Belvidere, and started east toward Chicago on Route 20, passing through Coral. Shortly thereafter defendant turned his car around and, as he proceeded westward, the right wheel of his car slipped off the edge of the cement highway, skidded across the pavement, and came to rest on the northwesterly side of the highway against a tree. As a result thereof, plaintiff sustained serious and permanent injuries, and on February 5, 1953, filed the instant complaint against the defendant to recover damages for those injuries. The issues made by the pleadings were submitted to a jury, resulting in a verdict finding the defendant not guilty. From an appropriate judgment rendered upon that verdict, the plaintiff appeals.

412

Counsel for appellant insists that the verdict of the jury and the judgment rendered thereon are against the weight of the evidence and that the court erred in its instructions.

According to the testimony of the plaintiff, as abstracted by her counsel, after her husband had gone up the street from Blatchford's Tavern between 9 and 10 o'clock on the evening of November 11, 1951, defendant "tapped me on the shoulder; his car was parked down the street headed the wrong way a short distance from the door of the tavern. Rinehart drove us down to the VFW Club. He had two bottles of beer; I walked away from the bar and talked to the blind man Fred Powell. That is all of the liquor I drank that night. While in the AmVets Club I told him I was going to try once more with my husband. I wanted to be fair with him and with my husband. Burdette Rinehart came back, gave me my coat and said he would take me back to Blatchford's where my husband was. We had been at the AmVets about forty-five minutes. This is located about one mile west of Belvidere. The car only stopped once for a light and then drove out Route 20; I told him to let me out any place and I would walk over to the tavern. He said he was going to take me to Chicago; I told him I wasn't going to Chicago; he could let me out any time. He drove 65 miles an hour to the Rainbow Gardens on Route 20; I was not willing to go to Chicago at any time; the automobile had a flat tire. I went to Laura and Bud's home there in a trailer; I had gone there before; I was asleep when he came back from fixing the tire. When Rinehart came back I said, 'You promised me you would take me back,' and he said, 'Yes.' We got into the automobile and started east, away from Belvidere, at 65 or 70 miles per hour; told him I would not go to Chicago and rather get out and walk. When he drove through Marengo, he did not make a complete stop for the stop sign; we drove

413

straight through Coral and he got mad and said, 'I'll take you back.' I had told him I didn't want to go to Chicago; he pulled in the driveway, turned around and said, 'All right, I'll take you back'; automobile started back toward Marengo. I noticed the speed of the car within two or three hundred feet before the accident. It was then going 80 miles per hour; knew where the ignition key was; just before the crash, I attempted to shut the car off; he grabbed my wrists and that is when we hit; I was conscious until the doctor gave me a hypo. I couldn't even move. The motor had come back and was against my legs. I had told Rinehart that if we would get married my daughter could be adopted by both of us; four days after the 1st hypo was administered I became conscious with pain all over my body. . . . There was no slackening of the speed of the auto from the time it came from the south edge of Coral until the accident. The speed increased up to this point to about 80 miles an hour. I told him to please slow down; he said if he couldn't have me, nobody else would. The last I remember was a loud crash. After we left Rainbow Gardens, I told him (defendant) that I wanted him to take me back. He said he was going to quit his job and get a job in Chicago, but he turned around and started back to Marengo. He was mad at me and he was going fast and I told him to slow down. I estimated the speed of the car at 80 miles an hour. Don't know whether Mr. Rinehart was intoxicated. I wasn't paying much attention, all I wanted to do was to go home."

The defendant testified that he left home on the evening in question between 7:30 and 8:00 o'clock, driving his 1946 Pontiac car; that he had not received any call from the plaintiff but was trying to locate her and drove to Blatchford's Tavern, where he saw his brother and also the plaintiff; that he said to her: "Are you coming with me or aren't you?" This witness then con-

tinued, as abstracted: "She picked up her coat and came out to the car with me; had no conversation with her as we went to the VFW Club. I told her we were going to the VFW Club. That is about all we said as we drove down to the club. She did not tell me at Blatchford's that she had something she wanted to tell me. Arrived at the club about 8:30 or quarter to 9. I recognized several people there; we sat on two stools and I asked her what she intended to do, finish her divorce and marry me or go back to the Swede (referring to the husband of the plaintiff) and let it go. She said that she wanted to marry me but things were so mixed up around her. She said, 'Let's go to Chicago.' I said, 'Tonight?' and she said, 'Yes.' She said 'You can get a job in there.' I had three bottles of beer and a shot at the VFW. I don't know whether she drank anything at the VFW; bought her something to drink; she did not tell me to take her back to Blatchford's; did not drive past Blatchford's Tavern on the way back; first place I stopped was the first stop sign; first stopped at Rainbow Gardens; had a flat tire; people I knew had a house-trailer; Mr. and Mrs. Verlon Cheek. Stopped the car about two city blocks from the Cheek trailer; had no further conversation with Mrs. Laurent between Belvidere and the Rainbow Gardens; did not tell her I would take her back. Mr. Cheek took me into Belvidere to get repairs for the flat tire in Mr. Cheek's Buick. Mr. Cheek drove me to my father's home in Belvidere; woke Dad up; went out; unlocked the station; put a patch on the tire; and we went back to my car at Rainbow Gardens. Put the tire on; went into a tavern after the tire was put on and ordered 12 ounce bottle of beer, Junior, Old Style. I paid for it. I did not drink my beer. Went over to the trailer; did not have any conversation with the other people in the trailer at that time; left the Rainbow Gardens; started east towards Chicago on route 20 at about 1:30 a. m.;

was going about 65, maybe 70 miles per hour; I do not recall any conversation between Mrs. Laurent and myself between the Rainbow Gardens and Marengo. Drove east out of Marengo a mile or a mile and a half and east of Coral. I asked her if she was sure she wanted to go to Chicago. She said, 'Let's go back to Belvidere to get some things and we can leave the following night or the night after.' Automobile was out of Coral; turned the car around in a farmer's field where he turns the tractor in and I backed out and pulled ahead of it and backed into it and turned my car around. Don't know what time it was; light traffic on 20 at that time; Mrs. Laurent was not crying; headed back towards Belvidere; she was not crying at any time; do not remember any conversation with her before the accident; going about 55 or 60 miles per hour as we went back through Coral; can't tell the jury what happened to my car after the wheel left the pavement. The wheel of the car dropped off the right edge. There is a small cement block there; saw it a year later. I received compound fracture of the right leg, a dislocated shoulder and lacerations of the face and head."

█ The foregoing is the testimony of the parties to this suit, and they were the only parties who witnessed the accident who testified. Counsel for appellant state that the words and conduct of defendant clearly indicated that defendant was in love with plaintiff and wanted her to return to him; that when she informed defendant that she intended to remain with her husband, defendant became angry and either intended to take the life of the plaintiff and himself or exhibited a wilful and wanton indifference as to the result of his own actions. It is true, as counsel state, that the evidence discloses that the highway was dry; that there was nothing to obscure defendant's view of the highway; that visibility was good; that the headlights of defendant's car were brightly burning; and

416

that the edge of the concrete pavement was visible as defendant's automobile travelled back toward Marengo and Belvidere through Coral. It is also true, as counsel state, that Loren Brown, a police officer, testified that he arrived at the scene of the accident shortly after it happened; that he asked defendant the routine questions asked by police on such occasions and that defendant stated to him that he was tired of living and that he was going to kill himself and the plaintiff. It is also in the record that the defendant denied that he told Brown, the police officer, after the accident that he intended to kill himself and the plaintiff and testified that he had no intention of injuring the plaintiff or himself. With the record in this condition, it cannot be held that defendant was guilty of wilful and wanton misconduct as a matter of law. Whether he was guilty or was not guilty of such conduct was a jury question. (*Bliss v. Knapp,* 331 Ill. App. 45; *McMillian v. McLane,* 338 Ill. App. 514.)

 The court, at the request of defendant, gave to the jury three instructions of which her counsel complain. One instruction told the jury that the plaintiff at and immediately prior to the time and place of the occurrence must have been free from any wilful and wanton misconduct which proximately caused or contributed to cause the injuries complained of. The criticism leveled at this instruction is that there was no evidence upon which it was based. The record, however, discloses that plaintiff testified she noticed that the car in which she had voluntarily placed herself with the defendant was travelling eighty miles per hour when it had reached a point 200 or 300 feet before it left the pavement; that she knew where the ignition key was and reached toward the key intending to turn the key and stop the engine; that when she reached for the ignition key, the defendant grabbed her wrist and almost immediately thereafter the crash occurred.

The court did not err in giving this instruction. It stated an applicable principle of law, and there was evidence which justified the court in giving it.

■ The second instruction complained of told the jury that "the plaintiff, Marion Laurent, is required to prove all of the elements of her case by the greater weight, or preponderance of the evidence, and if she has not so proved these elements, or if the evidence is evenly balanced so that you are unable to say on which side is the greater weight of the evidence, or if the greater weight of the evidence is in favor of the defendant, Burdette Rinehart, then, in any such event the plaintiff, Marion Laurent, cannot recover from the defendant, Burdette Rinehart." Counsel state that they are mindful of cases where the giving of this or a similar instruction has been held not to be reversible error, but counsel insist that the verdict in this case was the result of passion and prejudice returned by a jury composed largely of women and that they "confused the facts in reference to the plaintiff having temporarily lived away from her husband and having been friendly with the defendant and the real happening of the accident which had no relation with any conduct of the plaintiff except that this evidence explained how she happened to be in the automobile at the time of the accident." It is not insisted that the court admitted improper evidence or rejected any evidence offered by either party or that the jury was not fully instructed as to the issues made by the pleadings. The jury were in possession of all the facts which led to this unfortunate occurrence. This instruction states the law and has been approved in *Chicago Union Traction Co. v. Mee,* 218 Ill. 9; *Koshinski v. Illinois Steel Co.,* 231 Ill. 198, and more recently in *Alexander v. Sullivan,* 334 Ill. App. 42.

■ All that counsel say in their argument as to the other instruction complained of is that "after quoting

the guest statute this instruction continues with what purports to be a definition of wilful and wanton conduct." The instruction correctly defines wilful and wanton conduct. Plaintiff was a guest passenger in defendant's car, and the instruction gave to the jury a correct applicable principle of law.

We are unable to find any reversible error in this record. The jury was warranted in returning the verdict it did. The issues were clear cut and well defined by the pleadings and by the instructions. There is no support found in the record to the insistence of counsel that the verdict is the result of passion and prejudice against the plaintiff. It is the province of the jury to determine the issues of fact presented by the pleadings, and in our opinion the verdict of the jury is abundantly supported by the record. The judgment is affirmed.

*Judgment affirmed.*

MR. JUSTICE ANDERSON took no part in the decision or determination of this case.